State *v.* Lewis

STATE OF CONNECTICUT *v.* DEMETRICE L. LEWIS
(SC 20002)

Robinson, C. J., and Palmer, McDonald, D'Auria, Mullins and Ecker, Js.

*Syllabus*

The defendant, who was convicted, on a conditional plea of nolo contendere,
of carrying a pistol without a permit and criminal possession of a pistol
or revolver, appealed from the judgment of conviction, claiming, inter
alia, that the trial court improperly denied his motion to suppress a gun
found on his person during a patdown search by a police officer. The
defendant contended that the officer's seizure of him and patdown were
unlawful under the federal and state constitutions. A woman, V, had
called 911 at approximately 4 a.m. to report a domestic assault. V indi-
cated to the 911 dispatcher that, approximately fifteen minutes before-
hand, a black man identified as "O," whom V had been "dealing with,"
broke a window in her apartment and choked her. V noted to the
dispatcher that O was wearing black clothing and a fitted orange and
grey hat. V further explained that O had left her apartment but that she
could hear him talking outside of her open window and, thus, believed
that he was still nearby. V also told the dispatcher that O did not
have any weapons. Approximately five minutes after the 911 call, police
officers were dispatched to respond to the scene. The officers were
informed that it was a domestic violence incident involving choking and
that the perpetrator was likely in the area of the apartment, and they
were given a description of O and what he was wearing. The officer
who ultimately conducted the patdown search had been on patrol nearby
in his police vehicle when he responded to the call. Approximately
one minute after the dispatch call, the officer observed the defendant
standing alone in a parking lot area that was in close proximity to the
apartment, talking on a cell phone with no one else around, while it was
raining heavily. Believing that the defendant matched the description
of the perpetrator, the officer stopped and, while remaining in the vehi-
cle, asked the defendant his name. When the defendant did not respond,
the officer exited his vehicle, approached the defendant from an angle
so as not to appear confrontational, and again asked for his name,
where he was coming from, and whether he had any identification. The
defendant did not coherently answer the officer's questions, was slurring
his words and appeared to be under the influence of alcohol or controlled
substances. At one point, the officer believed that the defendant had
mumbled something that sounded like his name was "Michael." Shortly
thereafter, the officer began patting down the defendant for weapons
and felt the butt of the gun that the officer ultimately removed from his
person and that formed the basis for the charges of which he was
convicted. It was subsequently determined that the defendant was not
the perpetrator in the incident at the victim's apartment. In denying the
defendant's motion to suppress, the trial court determined that the

State *v.* Lewis

defendant was not seized until the officer touched him at the start of
the patdown. The court further concluded that the officer had reasonable
and articulable suspicion of criminal activity to stop the defendant and
that the patdown was supported by reasonable and articulable suspicion
that he might be armed and dangerous. On appeal to the Appellate
Court, that court upheld his conviction and agreed that the officer had
reasonable and articulable suspicion to stop the defendant, did not seize
the defendant until he touched him, and that the patdown was supported
by reasonable and articulable suspicion that he might be armed and
dangerous. On the granting of certification, the defendant appealed to
this court, claiming that he was unlawfully seized when the officer
stopped his patrol vehicle and asked his name or, alternatively, when
the officer approached him while asking him questions. The defendant
further claimed that the officer did not have reasonable and articulable
suspicion that the defendant was or had been engaged in criminal activity
or that he might be armed and dangerous. *Held* that the Appellate Court
correctly concluded that the trial court had properly determined that
the seizure and patdown of the defendant were lawful under both the
federal and state constitutions and, therefore, had properly denied the
defendant's motion to suppress the gun:

1. The defendant could not prevail on his claim that he was seized when the
officer stopped his patrol vehicle and asked for his name or, alternatively,
when the officer exited his vehicle and approached him while asking
questions, the defendant having failed to demonstrate that it was objec-
tively reasonable for him to believe that he was not free to leave prior
to the point at which the officer touched him: the placement of the
officer's vehicle did not impede the defendant's movement or prevent
him from leaving, the officer did not activate his vehicle's sirens or
overhead lights, command the defendant to halt or display a weapon,
and there was nothing coercive about the officer's conduct when he
first asked the defendant for his name; moreover, the officer approached
the defendant at an angle and did not block or impede his movement,
he did not issue any commands or display authority while asking the
defendant questions, and the officer's continued questioning after the
defendant failed to respond or responded incoherently did not become
coercive; furthermore, the defendant did not attempt to leave, ask the
officer to stop questioning him, or indicate that he was unwilling to
speak with the officer, and there was no case law to support the premise
that a seizure can occur solely on the basis of an officer's request to a
civilian to identify himself or to provide identification.

2. On the basis of the totality of the circumstances, including the similarity
in clothing that the perpetrator was described as wearing and the cloth-
ing that defendant actually was wearing, the geographical and temporal
proximity to the reported incident, the time of day, and the defendant's
location, the officer had reasonable and articulable suspicion to seize
the defendant when he commenced the patdown search: although there

State *v.* Lewis

were some discrepancies between the clothing that the perpetrator was reportedly wearing and the clothing that the defendant actually was wearing, the heavy rain and darkness where the defendant was standing made it difficult for the officer to discern details about the defendant's clothing other than the fact that the clothing appeared to be black, and the fact that the defendant appeared to match the general report of the perpetrator's appearance provided the officer with reasonable and articulable suspicion that the defendant was the perpetrator of the domestic violence incident; moreover, any doubt caused by the discrepancies in the description of the clothing was negated by the defendant's geographical and temporal proximity to the crime scene, as he was within one minute's walking distance from the placed of the reported incident a few minutes after the 911 call in which V stated that the suspect remained in the surrounding area; furthermore, notwithstanding the defendant's assertion that it was insignificant that he was standing alone in the early morning hours in the rain in a high crime neighborhood, the trial court did not rely on the fact that the reported incident occurred in an area known for criminal activity in determining that the officer had reasonable and articulable suspicion, as the officer did not stop the defendant on the basis of the characteristics of the neighborhood but on the basis that there was a reported domestic assault in the area.

3. The defendant could not prevail on his claim that, even if his seizure was lawful, the patdown during which the gun was found was unconstitutional because the officer lacked reasonable and articulable suspicion that he might be armed and dangerous, as the defendant was suspected of committing a violent crime, that is, domestic violence involving choking, and was discovered in close geographical and temporal proximity to the reported incident with an appearance generally matching the description of the perpetrator: because domestic violence situations are volatile situations in which the perpetrator at any moment may escalate the violence, and because a domestic violence incident involving choking increases the probability that the perpetrator might be armed with a weapon, it is reasonable for an officer to suspect, when little to no time has passed since the domestic violence incident, as in the present case, that such a perpetrator might be armed and dangerous; moreover, contrary to the defendant's assertion that the officer did not have reasonable suspicion that the defendant might be armed because the officer knew from the 911 call that the perpetrator was not armed, such knowledge did not detract from the reasonable and articulable suspicion the officer had, as V's report to the 911 dispatcher that the perpetrator had no weapons meant only that he had no weapons that the victim knew of, not that he was in fact unarmed, and there was no way for the officer to know if the perpetrator had acquired a weapon in the interim between the commission of the reported assault and the seizure.

(*Two justices concurring separately in one opinion*)

Argued January 18—officially released October 29, 2019

State *v.* Lewis

*Procedural History*

Substitute information charging the defendant with the crimes of carrying a pistol without a permit, criminal possession of a firearm and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of New Haven, where the court, *Cradle, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the defendant was presented to the court, *Keegan, J.*, on a conditional plea of nolo contendere to the charges of carrying a pistol without a permit and criminal possession of a pistol or revolver; subsequently, the state entered a nolle prosequi as to the charge of criminal possession of a firearm; judgment of guilty, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Beach* and *Bishop, Js.*, which affirmed the judgment of the trial court, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Laila M. G. Haswell*, senior assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Karen A. Roberg*, assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The facts of this case implicate governmental and privacy interests that courts struggle to reconcile. This court is no exception. On this record, there is no question that the defendant, Demetrice L. Lewis, illegally possessed a pistol. Responding to a report of a domestic violence incident, a police officer encountered the defendant. On the basis of a description of the perpetrator and other attendant circumstances, the police officer believed that the defendant might have been the perpetrator who, only minutes

State *v.* Lewis

earlier, had choked a woman and broken a window in her apartment. On that basis, the officer approached the defendant, attempted to ask him questions, and patted him down pursuant to *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). During this patdown, the police officer discovered the pistol and seized it after a brief struggle.

It turned out that the defendant was not the perpetrator. Rather, he was essentially minding his own business, standing in the rain with no one else around at 4:20 a.m., talking on his cell phone. However odd this behavior might appear to some, in this country, an individual enjoys the right to act in this manner undisturbed by the police unless the police have reasonable and articulable suspicion that he is involved in or about to be involved in criminal activity.

It is the solemn responsibility of our courts to ensure that when the police intrude on a person's privacy or liberty, they do so in strict adherence to the requirements of *Terry*. To ensure that the police have not overreached when they conduct investigatory stops, we require that the state articulate its justification so that a court may review it for objective reasonableness. Although this is a lower standard than probable cause, it is important that courts apply it vigilantly to guarantee that the police indeed have justification for even limited intrusions, and to guard against arbitrariness and harassment. The police cannot retroactively justify an investigatory stop and patdown on the ground that the patdown resulted in the discovery of illegal contraband.

In this case, we are once again confronted with the ill-defined notion of a "high crime neighborhood." We have noted in the past how this imprecise shorthand challenges—indeed, can undercut—our ability to apply it to a standard of suspicion that is meant to require circumspection before justifying a governmental inter-

State *v.* Lewis

ference with constitutionally protected interests. See *State* v. *Edmonds*, 323 Conn. 34, 69, 145 A.3d 861 (2016) ("cautioning that high crime area justification is easily subject to abuse" [internal quotation marks omitted]). Too often, reliance on the nature of the neighborhood too easily justifies intrusions on those who happen to reside in neighborhoods plagued by crime, which courts have recognized are inhabited predominantly by those with low incomes and disproportionately by minorities. See id., 83–84 (*Robinson*, *J.*, concurring). We have recognized that it is inappropriate that the poor and minorities come under suspicion, at least in part, because of their own surroundings, while those of greater wealth and majority status, although engaged in the same conduct, are less likely to suffer these intrusions and their accompanying indignities. See id., 83–85 (*Robinson*, *J.*, concurring).

We cannot ignore the fact that in the present case, the officer and the state, in part, justified the stop of the defendant on the basis of the reputation of the neighborhood.[1] Nor is that the only circumstance that challenges us in this case. The officer also testified that he "pat[s] everybody down." As we and the Chief Justice, in his concurring opinion, indicate, this is plainly an unacceptable and improper approach to law enforcement.

The officer was not, however, on routine patrol on general watch for those who might be acting illegally. Rather, he was responding to a 911 call from a victim reporting a domestic assault—specifically, that she had been choked by a male with whom she had been spending time. Within minutes, the officer was on the scene in search of the perpetrator, whose description the officer reasonably determined matched that of the defendant.

---

[1] Notably, in denying the defendant's motion to suppress evidence of a gun that the police had found on his person, the trial court did not rely on the character of the neighborhood to justify the initial seizure of the defendant.

State *v.* Lewis

It is easy for a court to question the officer's conclusions and actions. Indeed, that is our job. It is easier still to suggest that the officer could have or should have done something else, or even that a different course of action would have been more logical or more reasonable. That is not our job. Thus, in the present case, we do not determine whether the officer could have taken a less intrusive course of action but, rather, determine whether his actions—stopping the defendant and patting him down—were supported by reasonable and articulable suspicion.

The defendant contends that the trial court improperly denied his motion to suppress the gun on the ground that his seizure and subsequent patdown were lawful under both the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution. Specifically, he claims that the Appellate Court improperly concluded that the trial court correctly determined that (1) he was not seized until the police officer touched him and performed a patdown search for weapons, (2) the officer had reasonable and articulable suspicion that he had committed a crime, and (3) the officer had reasonable and articulable suspicion that he might be armed and dangerous. Although we recognize the unique challenges that this case raises, we disagree with the defendant's claims and conclude that the seizure and subsequent patdown of the defendant were lawful. We therefore affirm the judgment of the Appellate Court.

The following facts, as found in the record, and procedural history are relevant to our consideration of the claims on appeal. On May 25, 2013, at approximately 4:16 a.m., a woman called New Haven 911 to report a domestic assault on Derby Avenue in New Haven. The 911 caller informed the 911 dispatcher that approxi-

State *v.* Lewis

mately fifteen minutes earlier,[2] a thirty-two year old black man identified as "O,"[3] whom she had been "dealing with,"[4] had broken a window in her apartment and choked her. Although the victim stated that she did not need an ambulance, her assailant choked her hard enough that her throat was sore. She further explained that her assailant had left her home but that, although she could not see her assailant from her window, she could hear him talking, "so, he's around the area." She believed that he was most likely hiding in bushes or other dark places outside in the area. She also stated that she had his state identification. In response to an inquiry from the 911 dispatcher, the victim stated that the perpetrator did not have any weapons. She described her assailant as wearing a black hoodie, black sweatpants, and a chain around his neck. She stated that she believed that he also wore a fitted orange and grey hat. She did not give any additional details about the hat, such as, for example, whether the hat was predominantly more orange than grey or vice versa.

At approximately 4:19 a.m., police officers were dispatched to Derby Avenue to respond to the 911 call, which was reported as a domestic violence incident

---

[2] The trial court's memorandum of decision denying the defendant's motion to suppress states that the alleged crime occurred "only moments before Officer [Milton] DeJesus encountered the defendant . . . ." Both parties concede that this is not entirely accurate; the record establishes that the victim did not place the 911 call until approximately fifteen minutes after the alleged crime occurred.

[3] In accordance with our policy of protecting the privacy interests of the victim of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes §§ 46b-38a (1) and (2) (F) and 54-86e.

[4] The dispatcher appeared to interpret this statement by the victim to mean that the victim and the suspect were involved in some form of an intimate relationship. The defendant does not dispute that the 911 dispatcher understood the victim to be reporting a domestic violence incident, regardless of the specific nature of the relationship between the victim and suspect.

State *v.* Lewis

involving choking. The police dispatcher[5] described the perpetrator as a black male, "O," who was dressed in all black clothing and was believed to be outside the victim's home in bushes nearby because the victim had stated that she could hear him outside in the area. At the time of the dispatch call, Officer Milton DeJesus was patrolling the area, with which he was very familiar,[6] in a marked patrol vehicle and was approximately one quarter mile from Derby Avenue. Being in close proximity, he responded to the call and proceeded toward Derby Avenue. Approximately one minute after the dispatch call, while en route to Derby Avenue, Officer DeJesus observed the defendant, a black male in dark clothing, standing in a parking lot area to the right of a market at 1494 Chapel Street, which is near the corner of Chapel Street and Derby Avenue and approximately one minute's walking distance from Derby Avenue.

At the time that Officer DeJesus saw the defendant, it was dark and raining heavily. Because of this, the defendant was soaking wet, and his clothing appeared to Officer DeJesus to be all black, although the defendant was wearing dark blue jeans, a dark grey leather jacket, and a navy blue skullcap. Due to the pouring rain, Officer DeJesus could not discern any additional details about the defendant's clothing, such as its material. The defendant was standing alone in the rain and appeared to be speaking on a cell phone. A street lamp near the market parking lot illuminated the street onto

[5] The record does not reflect whether the dispatcher who sent out the call to the officers was the same person as or had any connection to the New Haven 911 dispatcher.

[6] Officer DeJesus testified at the suppression hearing that he grew up in the area and that the neighborhood had "a lot of prostitution, a lot of narcotics . . . transactions." In that area, he previously had made numerous arrests for drug related violations, weapons violations, and violence in general. The trial court accepted Officer DeJesus' testimony that the area of the alleged crime was a high crime neighborhood. The defendant in his briefs on appeal to this court does not challenge that finding.

State *v.* Lewis

the sidewalk area, allowing Officer DeJesus to see the defendant's presence, but the area around the defendant was not well lit. The defendant was the only person Officer DeJesus saw in the area.

Believing that the defendant matched the description of the suspect, Officer DeJesus stopped his patrol vehicle about fifteen feet from the defendant. He did not activate his vehicle's overhead lights. While remaining in the vehicle, he rolled down the driver's side window and asked the defendant, "yo, my man, what's your name?" The defendant did not respond and did not appear to notice Officer DeJesus. At that point, Officer DeJesus, who was wearing his police uniform, exited the patrol vehicle, approached the defendant from an angle, in an effort to appear nonconfrontational, and asked the defendant for his name, where he was coming from, and whether he had any identification. The defendant responded by "mumbling back." "It's like he'snot there," Officer DeJesus related, and so he asked the defendant what his name was several times more. Although most of the defendant's mumbling was incoherent, at one point Officer DeJesus thought the defendant mumbled something that sounded like "Michael" in response to a question about his name, but it was unclear because he was slurring his words. In response to the question about where he was coming from, the defendant mumbled something about being "in a program." The defendant did not otherwise coherently answer Officer DeJesus' questions, and he continued to hold the cell phone to his ear, did not appear stable, and was swaying. The only time the defendant made eye contact with Officer DeJesus, he did not appear "right." According to Officer DeJesus, the defendant was not acting normally or rationally but, rather, appeared guarded and under the influence of alcohol or controlled substances.

State *v.* Lewis

In light of the defendant's behavior, the violent nature of the alleged crime, and the time of day,[7] Officer DeJesus walked around him and began patting him down for weapons. The defendant immediately moved his right hand downward toward his side. Officer DeJesus told him, "no, hold on," and reached toward the defendant's waistband. To that point, the encounter from beginning to end had lasted less than one minute when Officer DeJesus felt the butt of a gun, after which he and the defendant began wrestling in the street for control of the gun.

As the defendant and Officer DeJesus wrestled for the gun, another officer arrived with a canine. Both officers commanded the defendant to stop resisting, but he did not comply. The canine then bit the defendant in the arm, subduing him, and the defendant was taken into custody and arrested. It was subsequently determined that the defendant was not the perpetrator in the incident on Derby Avenue.

The defendant was charged with carrying a pistol without a permit in violation of General Statutes § 29-35 (a), criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1). The defendant subsequently moved to suppress the gun on the ground that he had

_____

[7] At the suppression hearing, Officer DeJesus explained his reasons for patting down the defendant: "[W]hen I, initially, I asked him what's his name, his response, like I said, was not clear. He was mumbling. Not only that, it's just the way his—his movements are. It's four o'clock in the morning. I'm by myself. I have to use my common sense." He also explained that his response was due in part to the fact that the crime he was investigating involved choking and domestic violence, and that the defendant's mumbling, inattentiveness, and avoidance of eye contact made him appear guarded.

We note that Officer DeJesus also stated that his standard procedure was to "pat down everyone." Although we conclude that the defendant's constitutional rights were not violated, we do not condone this overbroad practice. See part III of this opinion.

State *v.* Lewis

been unlawfully seized and searched during an unlawful stop by the police in violation of the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution. The defendant argued that he was seized the moment Officer DeJesus stopped his patrol vehicle near him, the seizure was unlawful because Officer DeJesus lacked reasonable and articulable suspicion that the defendant had committed a crime, and the patdown was unlawful because his behavior was not sufficient to raise a reasonable and articulable suspicion that he might be armed and dangerous.

The trial court denied the defendant's motion to suppress. The court agreed with the state that the defendant was not seized until Officer DeJesus touched the defendant at the start of the patdown because Officer DeJesus did not display a show of authority or engage in coercive or threatening behavior until he touched the defendant. The court further found that Officer DeJesus had reasonable and articulable suspicion of criminal activity to stop the defendant because the defendant sufficiently matched the description of the suspect in the incident on Derby Avenue and was located in sufficiently close proximity to the alleged crime scene, both geographically and temporally. Finally, the court found that the patdown of the defendant was supported by reasonable and articulable suspicion that he might be armed and dangerous, on the basis of the totality of the circumstances, including the violent nature of the crime under investigation, the defendant's behavior, and the time of day. In making these findings, the court credited the testimony of the officer that in approaching and questioning the defendant, he intended to appear nonconfrontational, and the court found that he did indeed appear nonconfrontational, the rain and darkness made the defendant's clothing appear to be all black, and the

State *v.* Lewis

defendant's behavior made him appear guarded and evasive.

Following the denial of the motion to suppress, the defendant entered a conditional plea of nolo contendere to one count of carrying a pistol without a permit and one count of criminal possession of a pistol or revolver. The state entered a nolle prosequi with respect to the count of criminal possession of a firearm. The defendant was sentenced to five years of incarceration, execution suspended after a mandatory minimum of one year of incarceration, followed by a three year conditional discharge on the count of carrying a pistol without a permit, and five years of incarceration, execution fully suspended, with a three year conditional discharge on the count of criminal possession of a pistol or revolver. The sentences were to run consecutively for a total effective sentence of ten years of incarceration, execution suspended after one year, and a three year conditional discharge.

The defendant appealed to the Appellate Court, which affirmed the judgment of the trial court. See *State* v. *Lewis*, 173 Conn. App. 827, 851, 162 A.3d 775 (2017). The Appellate Court agreed with the trial court that Officer DeJesus' questioning of the defendant was not confrontational and that he did not seize the defendant until he touched him. Id., 841. The Appellate Court also agreed with the trial court that Officer DeJesus had reasonable and articulable suspicion to stop the defendant. Id., 847. The Appellate Court reasoned that, even if, under the collective knowledge doctrine,[8] Officer DeJesus were charged with knowing the precise details of the suspect's clothing as stated by the victim in the

_____

[8] Under the collective knowledge doctrine, in determining whether there is reasonable and articulable suspicion to search or seize a person, the arresting officer is credited with knowing, constructively, all that the law enforcement organization knew at the time of the seizure. *State* v. *Butler*, 296 Conn. 62, 72–74, 993 A.2d 970 (2010).

State *v.* Lewis

911 call, on the basis of the totality of the circumstances, it was reasonable for him to suspect the defendant of criminal activity. Id., 846–47. Specifically, the Appellate Court relied on the fact that (1) despite the discrepancies, the defendant's clothing, due to the darkness and rain, generally matched the description of the suspect's clothing, (2) the defendant was standing alone in the rain at 4:20 a.m. without anyone else around, (3) the defendant appeared to be under the influence of a controlled substance and was not responsive to Officer DeJesus, (4) the defendant was in close proximity to the crime scene, and (5) the defendant was in an area that Officer DeJesus knew to be prone to violence, drugs, and prostitution. Id. Relying on these same facts, the Appellate Court agreed with the trial court that the patdown of the defendant was supported by reasonable and articulable suspicion that he might be armed and dangerous. Id., 850–51.

The defendant petitioned for certification to appeal, which we granted, limited to the following issue: "Did the Appellate Court err in affirming the trial court's denial of the defendant's motion to suppress evidence of a firearm that police seized during an investigatory stop?" *State* v. *Lewis*, 327 Conn. 925, 171 A.3d 58 (2017).

On appeal to this court, the defendant argues that he was unlawfully seized and searched by Officer DeJesus. Specifically, he argues that he was seized the moment that Officer DeJesus stopped his patrol vehicle near the defendant and asked his name. Alternatively, he argues that he was seized when Officer DeJesus exited his vehicle and approached him while asking him questions. He further argues that regardless of when he was seized, the seizure was unlawful because Officer DeJesus did not have reasonable and articulable suspicion that the defendant was or had been engaged in criminal activity in light of the facts that his clothing and name did not match the clothing and name described

State *v.* Lewis

by the victim to the 911 dispatcher. Finally, he argues that the officer's patdown was similarly unlawful because there was no reasonable and articulable suspicion that he might be armed and dangerous. The state responds that the Appellate Court properly upheld the trial court's determination that the defendant was not seized until Officer DeJesus touched him and that the resulting seizure and patdown were based on reasonable and articulable suspicion in light of the totality of the circumstances.

We begin our analysis with our standard of review and well established overarching legal principles regarding search and seizure. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843–44, 955 A.2d 43 (2008).

"It is well established that we must undertake a more probing factual review of allegedly improper seizures, so that we may come to an independent legal determination of whether a reasonable person in the defendant's position would have believed that he was not free to leave. . . . A proper analysis of this question is necessarily fact intensive, requiring a careful examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority . . . . Although we must, of course, defer to the trial court's factual findings, our usual deference . . . is qualified by the necessity for a scrupulous examination of the record to ascertain whether [each] finding is supported by substantial evidence . . . ." (Citations

State *v.* Lewis

omitted; internal quotation marks omitted.) *State* v. *Edmonds*, supra, 323 Conn. 38–39.

"Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014).

"The fourth amendment [to the federal constitution and] article first, § 7, [of the state constitution proscribe] only 'unreasonable' searches and seizures. U.S. Const., amend. IV; accord Conn. Const., art. I, § 7. A search or seizure is presumptively unreasonable when it is conducted without a warrant issued upon probable cause. . . . [However], under [*Terry* v. *Ohio*, supra, 392 U.S. 30–31], officers may temporarily seize an individual if they have a reasonable and articulable suspicion that he is involved in criminal activity." (Citations omitted; footnote omitted.) *State* v. *Kelly*, 313 Conn. 1, 16, 95 A.3d 1081 (2014).

"[W]hen considering the validity of a . . . [*Terry*] stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Internal quotation marks omitted.) *State* v. *Edmonds*, supra, 323 Conn. 49. If the *Terry* stop is lawful and "the officer reasonably believes that the detained individual might be armed and dangerous, he or she [also] may undertake a patdown search of the

State *v.* Lewis

individual to discover weapons.'' *State* v. *Wilkins*, 240 Conn. 489, 495–96, 692 A.2d 1233 (1997).

I

We first address the defendant's claim that he was seized when Officer DeJesus stopped his patrol vehicle and asked his name because a reasonable person in the defendant's position would not have believed he was free to leave. Specifically, the defendant argues that Officer DeJesus evinced a show of authority by ''effectively blocking the defendant from the street using his marked police cruiser at a time when businesses were closed and the defendant was completely alone in the dark . . . .'' Alternatively, he argues that he was seized when Officer DeJesus exited his police cruiser and approached him while asking questions about his identity because Officer DeJesus' persistence in interacting with him amounted to a show of authority. The state responds that the defendant was not seized until Officer DeJesus physically touched him because Officer DeJesus' prior conduct was not coercive or confrontational. We agree with the state.[9]

We begin by setting forth the legal test used to determine when a person is seized for purposes of the federal

[9] Even if the defendant had been seized prior to being touched by the officer, such a seizure would have been proper because the officer would have had reasonable and articulable suspicion of criminal activity. As explained in part II of this opinion, throughout the officer's encounter with the defendant, the officer believed, and the trial court credited, that the defendant appeared to match the description of the suspect in a domestic violence incident that occurred in close geographical and temporal proximity to where the defendant was located and when the incident occurred, respectively. See footnote 17 of this opinion. Thus, even if the defendant had been seized when Officer DeJesus first called out to him, first questioned him, or asked him for identification, the totality of the circumstances—specifically, the defendant's appearing to match the description of the suspect, his geographical and temporal proximity to the crime scene, and his being the only person in the area at 4:20 a.m.—established reasonable and articulable suspicion.

State *v.* Lewis

and state constitutions. "[U]nder certain circumstances, the relevant provisions of the state constitution provide broader protection from unreasonable search and seizure than does the fourth amendment . . . ." (Citation omitted.) *State* v. *Edmonds*, supra, 323 Conn. 38 n.3. Under both constitutions, "[i]n determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . Under the federal constitution, in contrast, a seizure occurs only if there is a show of physical force . . . or . . . submission to the assertion of authority."[10] (Citations omitted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 404–405, 678 A.2d 1338 (1996). Accordingly, the defendant does not dispute that, under the federal constitution, he was not seized until Officer DeJesus physically touched him.

Under our state constitution, "[t]he inquiry is objective, focusing on a reasonable person's probable reaction to the [officer's] conduct. . . . In situations in which the police have not applied any physical force, we must conduct a careful [fact intensive] examination of the entirety of the circumstances in order to deter-

_____

[10] Prior to 1991, the same test was applied under the federal constitution and the Connecticut constitution to determine when a stop occurs as Connecticut continues to apply today. See *State* v. *Oquendo*, 223 Conn. 635, 646–47, 613 A.2d 1300 (1992). However, in *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), the United States Supreme Court abandoned this test and adopted its current test, requiring physical force or submission to the assertion of authority. This court previously has "decline[d] to adopt the restricted definition of a seizure employed by the United States Supreme Court in *Hodari D.* and [continues to] adhere to our precedents in determining what constitutes a seizure under the state constitution." *State* v. *Oquendo*, supra, 652.

State *v.* Lewis

mine whether the police engaged in a coercive display of authority [such that a reasonable person in the defendant's position would not have believed he was free to leave] . . . .'' (Citations omitted; internal quotation marks omitted.) *State* v. *Edmonds*, supra, 323 Conn. 50.

"Factors to be considered in determining whether police conduct projects coercion include, but are not limited to: the number of officers and vehicles involved; whether the officers are uniformed; whether the officers are visibly armed or have their weapons drawn; whether the vehicles involved are marked police cruisers, whether the vehicles' sirens and emergency lights are activated, and whether the vehicles' headlamps or spotlights illuminate the defendant; whether the defendant is alone or otherwise appears to be the target of police attention; the nature of the location, including whether it is public or private property; whether the defendant is surrounded or fully or partially blocked in by the police; the character of any verbal communications or commands issued by the police officers; whether the officers advise the detainee of his right to terminate the encounter; the nature of any physical contact; whether the officers pursue after an initial attempt by the defendant to leave; whether the officers take and retain possession of the defendant's papers or property; and any other circumstance or conduct that bespeaks aggressiveness or a show of force on the part of the police, or suggests that the defendant is under suspicion or otherwise not free to leave. . . . Although it is true that not all personal intercourse between [the police] and citizens involves seizures of persons . . . and that law enforcement officers must be free to engage in healthy, mutually beneficial intercourse with the public . . . it is equally true that use of coercion beyond that inherent in any police-citizen encounter transforms these sorts of informal, voluntary interactions into seizures." (Citations omitted; internal

State *v.* Lewis

quotation marks omitted.) Id., 50–51; see also *State* v. *Burroughs*, supra, 288 Conn. 846–47.

The defendant contends that he was seized when Officer DeJesus stopped his patrol vehicle because such conduct effectively blocked the defendant's egress while alone in the dark. It is true that "a seizure occurs when the police maneuver or park their vehicles, or approach a pedestrian on foot, in such a way as to block the pedestrian's path or effectively close off any avenue of escape." *State* v. *Edmonds*, supra, 323 Conn. 53. This is especially so if the defendant is located on private property where police are not normally expected to patrol. Id., 58.

The present case is distinguishable from the cases in which this court has held that a seizure occurred when a police officer stopped his patrol vehicle in a manner that blocked the defendant from leaving. See, e.g., id., 52 (stop occurred when police officers parked patrol vehicles at both of restaurant parking lot's exits to prevent defendant from leaving private property); *State* v. *Clark*, 297 Conn. 1, 8, 997 A.2d 461 (2010) ("officers had blocked the defendant's vehicle in a manner that restricted his freedom of movement"); *State* v. *Januszewski*, 182 Conn. 142, 147, 438 A.2d 679 (1980) (pedestrian constructively seized where police blocked his vehicle from leaving parking lot) (overruled in part on other grounds by *State* v. *Hart*, 221 Conn. 595, 609, 605 A.2d 1366 [1992]), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). Officer DeJesus stopped his patrol vehicle on the side of the road approximately fifteen feet from the defendant. The defendant was located in a parking lot area near to and open and visible from the street. The placement of the police cruiser did not impede the defendant's movement or prevent him from leaving in any way. On numerous occasions, we have stated that an officer stopping near a person, either in a police cruiser or on foot, without

State *v.* Lewis

more, does not impede the person's movement and, thus, is not coercive conduct that would cause a reasonable person to believe he was not free to leave. See, e.g., *State* v. *Benton*, 304 Conn. 838, 845, 43 A.3d 619 (2012) (officers stepping into roadway twenty feet from defendant did not constitute seizure); *State* v. *Burroughs*, supra, 288 Conn. 849–50 (stopping police vehicle behind defendant's vehicle without activating emergency lights or sirens was not seizure).

Additionally, Officer DeJesus did not activate his vehicle's sirens or overhead lights,[11] he did not command the defendant to halt, and he did not display any weapons. See *State* v. *Burroughs*, supra, 288 Conn. 846–47 (listing such actions as factors that may indicate coercion). The fact that Officer DeJesus also asked the defendant his name when he stopped his vehicle does not turn Officer DeJesus' conduct into a show of authority. "[C]ourts have made clear that police officers do not bring about a seizure merely by asking questions of a citizen, even when the officer identifies himself as a police officer . . . . It is axiomatic that the constitution does not prohibit, or even discourage, healthy, mutually beneficial intercourse between the public and the police sworn to protect them." (Citation omitted; internal quotation marks omitted.) Id., 853, citing *Immigration & Naturalization Service* v. *Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984); see also *Immigration & Naturalization Service* v. *Delgado*, supra, 216 ("interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a . . . seizure").[12]

---

[11] It is not clear from the record if the patrol vehicle's headlights were on. Even if they were, however, it would be "insignificant that the [officer] in the present case kept [the] headlights on, as this is a reasonable practice that would seem necessary, or at least advisable, for the officer['s] . . . safety when the event occurs at night." *State* v. *Burroughs*, supra, 288 Conn. 849 n.9.

[12] *Immigration & Naturalization Service* was persuasive authority in *Burroughs* and is persuasive authority in the present case because it was

Factors to consider in determining whether an officer's questioning amounted to a seizure under the state constitution include the time and place of the encounter; the officer's tone of voice, demeanor and choice of words; and whether there were others in the vicinity. See *State* v. *Oquendo*, 223 Conn. 635, 653, 613 A.2d 1300 (1992) (determining that seizure of defendant occurred when officer stopped his police cruiser late at night, stepped out, asked defendant's name, and commanded him to approach cruiser when no one else was in area but companion with whom defendant was walking); see also *State* v. *James*, supra, 237 Conn. 405 (considering officer's tone of voice and demeanor in determining whether police and civilian interaction was consensual). The record does not reflect that Officer DeJesus issued any command to the defendant when he stopped the patrol vehicle and asked his name. Rather, his demeanor and tone of voice were nonconfrontational, as credited by the trial court and manifested by his word choice of "yo, my man . . . ." Although the defendant was the only person in the area and it was late at night, there was nothing coercive about Officer DeJesus' conduct when he first asked the defendant his name.

Similarly unavailing is the defendant's argument that he was seized when Officer DeJesus, wearing his police uniform, exited the patrol vehicle, approached the defendant, and asked him questions. "Although we recognize that a uniformed law enforcement officer is necessarily cloaked with an aura of authority, this cannot, in and of itself, constitute a show of authority . . . ." *State* v. *Burroughs*, supra, 288 Conn. 849. Rather, we must look at the totality of the circumstances. Officer

decided prior to *California* v. *Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), when the same test to determine when a stop occurs applied under both the federal and the Connecticut constitution. See footnote 10 of this opinion.

State *v.* Lewis

DeJesus approached the defendant at an angle and did not block or impede his movement. Cf. *State* v. *Edmonds*, supra, 323 Conn. 52 (patrol cars blocked defendant's egress). The trial court found that the officer had approached the defendant in a nonconfrontational manner. Merely walking toward someone, without more, is not coercive behavior. See, e.g., *State* v. *Hill*, 237 Conn. 81, 91, 675 A.2d 866 (1996) ("[t]he mere approach by a police officer, either in a police car or on foot, does not alone constitute a show of authority sufficient to cause the subject of the officer's attention reasonably to believe that he or she is not free to leave").

Additionally, although Officer DeJesus asked the defendant questions, he did not issue any commands or display authority. See, e.g., *State* v. *Burroughs*, supra, 288 Conn. 853 ("police officers do not bring about a seizure merely by asking questions"). The defendant responds that even if Officer DeJesus' initial questions did not constitute a seizure, once he failed to respond to the questions, Officer DeJesus' continued questioning became coercive. This argument fails. Prior to the defendant's and Officer DeJesus' wrestling over the gun, the entire encounter lasted approximately one minute. Officer DeJesus asked the defendant his name, whether he had identification, and from where he was coming. Although, depending on the circumstances, a command to provide identification can amount to a seizure, especially if the officer's demeanor and tone of voice are confrontational, the record in the present case does not reflect that the officer, in a confrontational manner, commanded the defendant to provide identification. Moreover, although Officer DeJesus did ask the defendant his name several times, he did so because the defendant mumbled incoherent responses. Asking these three general questions—what was the defendant's name, did he have identification and from where he was coming—does not amount to questioning that

State *v.* Lewis

is so persistent as to be coercive.[13] See *State* v. *James*, supra, 237 Conn. 405 ("[p]olice officers do not violate an individual's constitutional rights . . . by putting questions to him if he is willing to listen" [internal quotation marks omitted]); see also *Immigration & Naturalization Service* v. *Delgado*, supra, 466 U.S. 216 (*request* for identification is not seizure).

Although police questioning may become coercive and deemed a seizure under our state constitution if the interaction between the officer and civilian becomes nonconsensual; see *State* v. *Edmonds*, supra, 323 Conn. 51; the record in this case does not reflect that the defendant was unwilling to answer Officer DeJesus' questions. The defendant never asked or attempted to leave, never requested that questioning cease, and never indicated that he was unwilling to speak with the officer. The defendant argues that it was clear, on the basis of his unresponsive conduct, that he was unwilling to interact with the officer. The defendant, however, mumbled during the course of the encounter, appearing to attempt to respond to at least some of the officer's questions. The record does not reflect any conduct on the defendant's part that would have suggested to Officer DeJesus that he was unwilling to answer the questions or was asking or attempting to leave.

Moreover, the defendant has failed to cite a single case in which this court or any court has held that a

---

[13] The defendant also argues that the officer's questioning was coercive because he asked questions to which he already knew the answer. Specifically, Officer DeJesus knew, or is credited with knowing, that the victim had the suspect's identification. See part II of this opinion. This argument fails for two reasons. First, asking for identification is one way to confirm or dispel suspicion that the defendant is the suspect; possession of identification could dispel the officer's suspicion. Second, it is hardly unreasonable to expect that individuals might have more than one form of identification. Thus, although the suspect left one form of identification with the victim, it was possible that the suspect had other forms of identification such as a credit card or a library card.

State *v.* Lewis

seizure occurred solely on the basis of an officer's request to a civilian to identify himself or to provide identification. Rather, the cases cited by the defendant in support of his argument that continued questioning is coercive are distinguishable. In *Johnson* v. *Campbell*, 332 F.3d 199, 202–203 (3d Cir. 2003), after a police officer approached the defendant, who was sitting in his parked vehicle, the officer did not only persist in asking the defendant questions, but also issued a command that the defendant roll down his car window and provide identification. The defendant in *Johnson* complied with the command, thus submitting to the officer's show of authority, which constituted a seizure under the federal constitution. Id., 203, 205–206. The other cases cited by the defendant, none of which involves this state's constitution, either involved an officer asking a defendant not to leave; *United States* v. *Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (reasonable person would not feel free to leave when officer asked him to stay where he was); or involved a defendant who either asked to leave or attempted to leave but was prevented from leaving by further questioning. *People* v. *Morales*, 935 P.2d 936, 939–40 (Colo. 1997) (holding that defendant was not seized when asked questions about his identity and where he was going, but that he was seized when he said he was leaving and police continued to question him about possible criminal conduct); *State* v. *Stovall*, 170 N.J. 346, 358, 788 A.2d 746 (2002) (although initial questioning was permissible, questioning became seizure when defendant said she wanted to leave and officer asked her to stay). In contrast, as explained, in the present case, Officer DeJesus issued no commands, and the defendant did not ask to leave or attempt to leave.

Under these circumstances, the defendant has failed to demonstrate that it was objectively reasonable for him to believe that he was not free to leave prior to

State *v.* Lewis

Officer DeJesus' touching him. Thus, under the state constitution, the defendant was not seized either when Officer DeJesus stopped his patrol vehicle or when he approached the defendant while asking him questions. Rather, the Appellate Court correctly concluded that the trial court had properly determined that under both the federal and state constitutions, the defendant was seized when Officer DeJesus physically touched him, which was a show of authority. See, e.g., *State* v. *Kelly*, supra, 313 Conn. 10 (use of physical force constitutes seizure).

II

Next, we turn to the defendant's claim that regardless of when he was seized, Officer DeJesus lacked reasonable and articulable suspicion to seize him. Specifically, he argues that Officer DeJesus lacked reasonable and articulable suspicion that he was the suspect in the domestic violence incident because his clothing did not match the description given by the victim to the 911 dispatcher. The defendant contends that the collective knowledge doctrine; see footnote 8 of this opinion; which imputes the collective knowledge of the law enforcement organization to the investigating officer, applies in this case, and, thus, Officer DeJesus must be credited with having known all of the details of the suspect's description that the victim gave to the 911 dispatcher, regardless of whether those details were conveyed to the officer.

The state counters that the trial court and the Appellate Court correctly determined that even if the collective knowledge doctrines applies, the defendant sufficiently matched the description of the suspect so as to raise a reasonable and articulable suspicion that he was the suspect in the domestic violence incident, especially given the weather, time of day, and the defendant's proximity in time and location to the crime scene.

333 Conn. 543 OCTOBER, 2019 569

State *v.* Lewis

Thus, the state contends that the defendant's seizure was lawful under both the state and federal constitutions. We agree with the state.

Under both the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the constitution of Connecticut,[14] in determining whether a seizure is lawful, a court must find that the seizure was supported by reasonable and articulable suspicion that the individual was engaged in or about to engage in criminal activity. See, e.g., *State* v. *Groomes*, 232 Conn. 455, 467–68, 656 A.2d 646 (1995). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content [from] that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause." (Internal quotation marks omitted.) Id., 468.

"Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . [I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*,

[14] This court consistently has held that, unlike the test applied in determining when a seizure occurs, the test for reasonable and articulable suspicion is the same under both the state and federal constitutions. See *State* v. *Oquendo*, supra, 223 Conn. 654. Because the defendant has not provided an independent state constitutional analysis asserting the existence of greater protection under the state constitution, we analyze his claim under the assumption that his constitutional rights are coextensive under the state and federal constitutions. See, e.g., *State* v. *Benton*, supra, 304 Conn. 843 n.3.

State *v.* Lewis

258 Conn. 68, 75, 779 A.2d 88 (2001). "In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Internal quotation marks omitted.) Id., 76.

In considering the totality of the circumstances, courts consider "[t]he nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, [and] the reaction of the suspect to the approach of police . . . . Proximity in the time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion. . . . [N]ervous, evasive behavior . . . [also] is a pertinent factor in determining reasonable suspicion. . . . [P]olice officers may reasonably act upon observation of a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." (Citations omitted; internal quotation marks omitted.) *State* v. *Miller*, 137 Conn. App. 520, 539, 48 A.3d 748, cert. denied, 307 Conn. 914, 54 A.3d 179 (2012).

Moreover, the totality of the circumstances is not based solely on the observations and knowledge of the investigating officer, but on the collective knowledge of the law enforcement organization at the time of the seizure. See *State* v. *Butler*, 296 Conn. 62, 73, 993 A.2d 970 (2010) (applying collective knowledge doctrine to determination of whether police had reasonable and articulable suspicion for protective search of defendant's vehicle). As an initial matter, the defendant urges this court to extend the collective knowledge doctrine to include information known by a civilian 911 dispatcher. This court has not previously determined whether the doctrine applies in a situation in which information is received by a civilian 911 dispatcher and then relayed to a police officer. Federal Circuit Courts

State *v.* Lewis

of Appeals are not in agreement on this question. Compare *United States* v. *Whitaker*, 546 F.3d 902, 909–10 n.12 (7th Cir. 2008) (knowledge of civilian 911 dispatcher can be imputed to police officer), with *United States* v. *Colon*, 250 F.3d 130, 137–38 (2d Cir. 2001) (knowledge of 911 dispatcher could not be imputed to arresting officer when there was no evidence that dispatcher had special training so as to be capable of determining whether reasonable suspicion existed).

In the present case, however, the record is not clear whether the 911 dispatcher was a civilian dispatcher. The record reveals only that the victim called 911 and that the phone was answered by an individual who responded, "New Haven 911." Additionally, although the police dispatcher subsequently provided a description of the suspect via radio to the officers, there is no evidence regarding whether this dispatcher was the same person as the 911 dispatcher or whether the dispatch communication sent to the officers was sent through the same dispatch system as the 911 call.

Moreover, it is unsettled both in this state and under federal law whether a defendant may use the collective knowledge doctrine to negate, as opposed to support, the existence of reasonable and articulable suspicion. See *State* v. *DeMarco*, supra, 311 Conn. 530–33 (holding that collective knowledge doctrine did not apply to impute knowledge of defendant's phone number to arresting officer for purposes of determining whether emergency exception to warrant requirement applied, but not deciding whether collective knowledge doctrine ever could be used to exonerate defendant); see also *United States* v. *Hicks*, 531 F.3d 555, 560 (7th Cir. 2008) (collective knowledge doctrine does not apply in efforts to negate reasonable and articulable suspicion, as even imputed knowledge that contains inconsistencies can give rise to reasonable suspicion if police officer's reliance on it was reasonable); *United States* v. *Holmes*,

State *v.* Lewis

376 F.3d 270, 277 n.3 (4th Cir. 2004) (collective knowledge doctrine does not impute uncommunicated exculpatory knowledge to fellow police officers); *Savino* v. *New York*, 331 F.3d 63, 74 (2d Cir. 2003) ("the doctrine has traditionally been applied to assist officers in establishing probable cause—not . . . to impute to an officer facts known to some [other] members of the police force which exonerate an arrestee" [emphasis omitted; internal quotation marks omitted]); *United States* v. *Meade*, 110 F.3d 190, 197 n.9 (1st Cir. 1997) (declining to apply collective knowledge doctrine to impute knowledge to officer who specifically denied knowing exculpatory fact known by another officer). But see *United States* v. *Twiss*, 127 F.3d 771, 776 (8th Cir. 1997) (Gibson, J., dissenting) ("it is the collective knowledge of the officers that is material, and this must apply to exculpatory evidence, and defeats a conclusion of probable cause"). Nevertheless, we need not decide these issues because, even if we assume that the collective knowledge doctrine applies in this case, we conclude, on the basis of the totality of the circumstances, including any facts known to the 911 dispatcher, that Officer DeJesus had a reasonable and articulable suspicion that the defendant had committed the crime under investigation.

First, the trial court credited Officer DeJesus' determination that because of the rain and darkness, the defendant's clothing appeared to sufficiently match the description of the suspect's clothing.[15] "The police . . .

---

[15] In the alternative to applying the collective knowledge doctrine, the defendant argues that Officer DeJesus lacked reasonable suspicion because the description of the suspect he was given by the police dispatcher (black man in all black clothing) was too general. Specifically, the defendant argues that reasonable and articulable suspicion cannot be based on a vague and generic description of a suspect.

Because we apply the collective knowledge doctrine, we conclude that the description of the suspect given by the police dispatcher is not deemed too general in light of Officer DeJesus' being credited with also knowing the full details of the 911 call. Nevertheless, even in the absence of the collective knowledge doctrine, Officer DeJesus had reasonable suspicion

State *v.* Lewis

are not required to confirm every description of the
perpetrator that is broadcast over the radio. What must
be taken into account is the strength of those points
of comparison which do match up and whether the
nature of the descriptive factors which do not match is
such that an error as to them is not improbable . . . .
Moreover, account must be taken of the possibility that
by . . . efforts of concealment some aspects of the
description may no longer be applicable.'' (Citation
omitted; internal quotation marks omitted.) *State* v.
*Kyles*, 221 Conn. 643, 663, 607 A.2d 355 (1992).

Although the defendant was wearing dark blue jeans,
a dark grey leather jacket, and a navy blue skullcap,
Officer DeJesus testified at the suppression hearing that
the clothing appeared to him to be all black because
the clothing was soaking wet from the rain, and the
area where the defendant was standing was dark and
poorly lit. Similarly, because of the rain and lighting, it
was difficult for Officer DeJesus to discern any details
about the defendant's clothing, such as its material.
Although it is true that the defendant was not wearing
a black hoodie or black sweatpants or a fitted grey and
orange hat when he was seized by Officer DeJesus,

on the basis of the totality of the circumstances of which he was aware—
specifically, the defendant's geographical and temporal proximity to the
crime scene. See *State* v. *Carter*, 189 Conn. 611, 617, 458 A.2d 369 (1983)
(although description of black male wearing dungaree type clothing might
be too general in other contexts, at 3 a.m., close to scene of two recent
burglaries, description was sufficiently distinctive to give rise to reasonable
and articulable suspicion that defendant had engaged in criminal activity);
see also *United States* v. *Arthur*, 764 F.3d 92, 98 (1st Cir. 2014) (Although
a general description of a black man in black clothing, "standing alone,
would likely be insufficient to give rise to reasonable suspicion . . . every-
thing depends on context and, in this instance, the description did not stand
alone. [The police] [o]fficer . . . was entitled to rely on the description in
combination with other clues: the precise number of robbers, the immediacy
of the robbery, the suspects' close proximity to the crime scene, the direction
in which the men were headed, and the dearth of others in the critical two-
block area. The totality of the circumstances supported a logical inference
that the appellant and his companion were the robbers.'').

State *v.* Lewis

even if these discrepancies were obvious to Officer DeJesus at the time of the seizure—as he had responded to a 911 call reporting domestic violence—they did not negate the reasonable and articulable suspicion he had that the defendant was the suspect. See, e.g., *State* v. *Gregory*, 74 Conn. App. 248, 259–60, 812 A.2d 102 (2002) ("[g]iven . . . the lack of lighting in the area, combined with the fact that the description provided was similar, although not identical, to what the defendant was found wearing, and that the defendant's physical characteristics were the same as the [suspect's] . . . we conclude that there was a reasonable and articulable suspicion for the police to detain him" [citations omitted]), cert. denied, 262 Conn. 948, 817 A.2d 108 (2003); see also *State* v. *Mitchell*, 204 Conn. 187, 190, 196, 527 A.2d 1168 (1987) (that defendant was wearing blue sweatpants, not maroon sweatpants as described by victim, did not negate reasonable suspicion).

It may be argued that even in the dark, an orange hat would not appear black. But, as explained, the *Terry* standard does not demand a perfect match in descriptions. See, e.g., *State* v. *Kyles*, supra, 221 Conn. 663. The record reveals that the victim was equivocal about whether the suspect wore a hat, stating that she "believed" he wore an orange and grey fitted hat.[16] She provided no further details regarding the hat, such as, for example, whether it was more orange than grey or vice versa. Even if the suspect was wearing an orange and grey hat, perhaps the orange portion of the hat might have been small enough to blend in with the grey when wet and in the dark. Given the dark and rainy conditions, and allowing for—as a reasonable responding police officer might—the possibility of human error by the victim in relating a detailed description of the perpetrator, we believe that the defendant's appearing

_____

[16] In contrast, the victim stated without hesitation that the suspect was wearing a black hoodie, black sweatpants, and a chain around his neck.

State *v.* Lewis

to match this general report of the perpetrator's appearance provided Officer DeJesus with a reasonable and articulable suspicion sufficient to pat him down.

The defendant responds that even if his clothing might have appeared from a distance to sufficiently match the description of the victim's clothing, once Officer DeJesus got closer to the defendant, his clothing should have dispelled any suspicion. As we explained, the purpose of a *Terry* stop is to confirm or dispel the officer's suspicion that an individual has committed or is about to commit a crime. See *State* v. *Kyles*, supra, 221 Conn. 660. ''The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.'' (Internal quotation marks omitted.) *State* v. *Mitchell*, supra, 204 Conn. 197.

The defendant's argument that Officer DeJesus' suspicions should have been dispelled upon viewing his clothing up close is unpersuasive on the record before this court. The present case is distinguishable from the case cited by the defendant in which there was evidence that, upon approaching the defendant, the officer could see that the defendant's appearance did not match the description of the suspect, thereby dispelling any reasonable suspicion the officer had that the defendant was the suspect. See *United States* v. *Watson*, 787 F.3d 101, 105 (2d Cir. 2015) (holding that reasonable suspicion to detain individual whom police officer mistakenly believed was robbery suspect no longer existed once officer got close enough to observe individual clearly and see that individual did not match description of robbery suspect). In the present case, there is no evidence that as Officer DeJesus got closer to the defen-

State *v.* Lewis

dant, his observations changed regarding the defendant's clothing. Rather, he consistently testified that the defendant's clothing appeared to him to be all black and that it was hard to see. The trial court credited this testimony and, thus, so must we.[17] See, e.g., *State* v. *DeMarco*, supra, 311 Conn. 520 ("[w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude" [internal quotation marks omitted]).

Second, any doubt caused by the discrepancies in the description of the clothing was negated by the defendant's geographical and temporal proximity to the crime scene. See *State* v. *Miller*, supra, 137 Conn. App. 539–40 (although defendant was wearing windbreaker, not puffy black jacket, officer still had reasonable suspicion because of "defendant's lone presence, close in temporal and physical proximity to the scene of the burglary"); see also *State* v. *Kyles*, supra, 221 Conn. 661 n.11 ("[p]roximity in time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion" [internal quotation marks omitted]); *State* v. *Carter*, 189 Conn. 611, 616–17, 458 A.2d 369 (1983) (same). The defendant was located within one minute's walking distance from the crime scene a few minutes after the 911 call in which the victim stated that the suspect remained in the surrounding area.

_____

[17] Because the defendant's clothing appeared to match the description of the suspect's clothing at all times during and leading to the seizure, even if the defendant had been seized prior to the patdown, the officer still had reasonable and articulable suspicion to seize him, in light of the totality of the circumstances—specifically, the defendant appeared to sufficiently match the description of the suspect, he was in close geographical and temporal proximity to the crime scene, and he was the only person in the area at 4:20 a.m.

State *v.* Lewis

The defendant counters that his location did not create reasonable and articulable suspicion because the crime occurred fifteen minutes prior to the 911 call, and, thus, it was not reasonable to assume that the suspect remained nearby; see *Bennett* v. *United States*, 26 A.3d 745, 753 (D.C. 2011) ("the lapse in time between when the robbery occurred and when the stop occurred was long enough that it did not reasonably support an inference that [the] appellant was involved in the robbery because of . . . his proximity to the crime scene"); or alternatively, Officer DeJesus should have known that the suspect remained outside the victim's house in the bushes, not down the street. We find neither argument persuasive.

The fact that the defendant was not located directly in front of or in the bushes near the victim's home does not negate the significance of the defendant's geographical proximity to the scene of the crime. The police are allowed to take into account the possibility that, in the time between the crime and when they received the dispatch call about the crime, a suspect might have changed locations and not remained stagnant. In determining the significance of a defendant's geographical proximity to a crime scene, the appellate courts of this state have considered whether the defendant's location was someplace where the suspect might reasonably be on the basis of the amount of time that passed since the occurrence of the crime. See *State* v. *Kyles*, supra, 221 Conn. 661 (defendant's "vehicle was sighted less than ten minutes and two miles from the crime scene"); *State* v. *Manousos*, 179 Conn. App. 310, 322, 178 A.3d 1087 (officer sighted defendant twenty seconds after receiving dispatch and within 300 feet of crime scene), cert. denied, 328 Conn. 919, 181 A.3d 93 (2018); see also *State* v. *Rodriguez*, 239 Conn. 235, 246, 684 A.2d 1165 (1996) (reasonable suspicion created by "the fact that the short distance from the crime scene

State *v.* Lewis

easily could have been traveled on foot in the time intervening since the crime''). Thus, the defendant's geographical proximity to the crime scene is a factor supporting reasonable and articulable suspicion that he committed the crime under investigation.

The defendant counters that because the victim had reported that the suspect was outside her home in the bushes, it would have been more reasonable for Officer DeJesus first to drive to the scene of the crime to determine whether the suspect remained there. Although such action might be reasonable, we do not agree that it makes Officer DeJesus' decision to first investigate the defendant unreasonable. First, the victim had reported that she could hear the suspect talking in the area near her home, but she could not see him from her window and speculated that he might be in the bushes or hiding in some other dark area. Officer DeJesus came upon the defendant in a dark area, talking on a cell phone, in the area of the victim's home. The defendant's location was consistent with the location of the suspect as reported by the victim. Second, if an officer is required to first proceed to the crime scene before investigating suspicious circumstances, an officer may risk losing key evidence. For example, if the defendant in this case had been the suspect but the officer was required to first go to the victim's home, the defendant may have left the area by the time the officer realized the suspect no longer was located outside the victim's home. Third, Officer DeJesus testified at the suppression hearing that at the time of the stop, he was aware that other police units had been dispatched and were on their way to the scene of the crime. Thus, he knew that if the suspect remained at the scene of the crime, other officers would apprehend him.

Similarly, the defendant's argument regarding the lapse in time between the crime and his seizure by Officer DeJesus is unpersuasive. Although the crime occurred

State *v.* Lewis

fifteen minutes before the 911 call, the 911 call was made within a matter of minutes before the seizure. During the 911 call, the victim stated that the suspect was still in the area because she could hear him talking. Thus, Officer DeJesus knew that the suspect had been outside the victim's home a few minutes prior to seeing the defendant. As such, the lapse in time between the commission of the crime and the seizure does not negate the significance of the defendant's proximity in time to the scene of the crime.

The defendant also was the only person in the area late at night in the pouring rain. See, e.g., *United States* v. *McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (reasonable suspicion existed to stop suspect, who was walking alone with no other pedestrians about, approximately 200 feet west of crime scene just minutes after reported burglary attempt), cert. denied, 552 U.S. 1042, 128 S. Ct. 645, 169 L. Ed. 2d 515 (2007); *State* v. *Manousos*, supra, 179 Conn. App. 323 ("[T]he defendant was the only person on foot in the area. . . . This fact further supports a finding of reasonable suspicion."). The defendant responds that his standing alone in the early hours of the morning in the rain in a "high crime" neighborhood is insignificant because he was in a populated neighborhood, it was not inconceivable that people would be outside in the early morning, and he was merely talking on his cell phone, a commonplace activity. Although the defendant's conduct may be viewed as innocent and commonplace, "[w]e do not consider whether the defendant's conduct possibly was consistent with innocent activity but, rather, whether the rational inferences that can be derived from it reasonably suggest criminal activity to a police officer." (Internal quotation marks omitted.) *State* v. *Peterson*, 320 Conn. 720, 731, 135 A.3d 686 (2016). In the present case, Officer DeJesus knew, or is credited with knowing, that the suspect was in the vicinity of the crime and that the victim had heard

State *v.* Lewis

him talking. The defendant was the only person in the vicinity, alone, in the dark, talking on his cell phone at approximately 4:30 a.m. Such facts support a finding of reasonable and articulable suspicion.

Nevertheless, we agree with the defendant that the nature of the neighborhood should not determine the extent of a person's constitutional rights. Although it is true under the federal constitution that the nature of the area where a person was detained may be considered as part of the totality of the circumstances analysis; *State* v. *Nash*, 278 Conn. 620, 634–35, 899 A.2d 1 (2006); we have cautioned against overreliance on an individual's location in a neighborhood plagued by crime. See *State* v. *Edmonds*, supra, 323 Conn. 68–69; *State* v. *Benton*, supra, 304 Conn. 848 n.7. In general, resort to shorthand terms such as "high crime neighborhood" are not particularly helpful to the required analysis and can have the deleterious effect of increasing—rather than decreasing—the risk of arbitrary intrusions upon innocent citizens. Officers may not pat down a neighborhood's residents under the assumption that criminal activity might be afoot merely because the neighborhood is plagued by crime. See *State* v. *Oquendo*, supra, 223 Conn. 655 n.11 ("[a] history of past criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality" [internal quotation marks omitted]). For the nature of the neighborhood to be relevant to the totality of the circumstances analysis, officers must specifically identify the nature of the neighborhood and the types of crimes associated with it that give rise to the officer's reasonable and articulable suspicion that this particular defendant engaged in the crime under investigation.[18] See *United States* v.

---

[18] Similarly, for a court to determine whether the nature of the neighborhood gives rise to reasonable and articulable suspicion that the defendant is armed and dangerous, the officer must specifically identify the nature of the neighborhood and the types of crimes associated with it that caused the officer to have such suspicion. See part III of this opinion.

State *v.* Lewis

*Wright*, 582 F.3d 199, 220–21 (1st Cir. 2009) ("[T]he evidence relevant to a high crime area finding ordinarily should include some combination of factors showing a link between the incidence of specific criminal activity in the area and the police officers' suspicions about the defendant. . . . A high incidence of crime in an area may provide such a link when the evidence establishes a similarity between the crimes that most commonly occur there and the crime suspected in the instant case. . . . [There must be] a 'nexus' between the crime prevalent in the area and the crime suspected . . . ." [Citations omitted.]), cert. denied, 559 U.S. 1021, 130 S. Ct. 1919, 176 L. Ed. 2d 390 (2010).

In the present case, Officer DeJesus testified that the area in which the alleged domestic violence incident occurred was known for narcotics, prostitution, and violence in general. Officer DeJesus never testified that the nature of the neighborhood contributed to his suspicion that the defendant was the suspect.[19] Such testimony is lacking because nothing about the nature of the neighborhood made it any more or less likely that the defendant was the suspect in the domestic violence incident to which the officer was responding. Officer DeJesus did not stop the defendant on the basis of the characteristics of the neighborhood; he stopped the defendant because there was a reported domestic assault in that particular area, and he believed that the defendant fit the description of the perpetrator.

In fact, the trial court in the present case did not rely on this factor in determining whether there was reasonable and articulable suspicion for the seizure. Similarly, we do not find the fact that the defendant was

[19] We note that the defendant does not contend, and there is no evidence in the record to support, that Officer DeJesus arbitrarily patted him down or stopped him because he assumed that the defendant had committed a crime merely because the defendant was present in a high crime neighborhood.

State *v.* Lewis

in a neighborhood known for violence, narcotics, and prostitution significant to the determination of reasonable and articulable suspicion to seize him. Specifically, the fact that he was standing alone in such a neighborhood did not connect him in any way to the crime under investigation. Rather, it was the defendant's location so close to the alleged crime scene that supported the officer's reasonable and articulable suspicion, without considering the nature of the neighborhood.

Despite these circumstances supporting reasonable and articulable suspicion, the defendant counters that other circumstances should have dispelled suspicion. Specifically, the defendant argues that because his behavior was indicative of his having been under the influence of alcohol or a controlled substance and the victim did not report that the suspect was inebriated, Officer DeJesus should have known that he could not have been the suspect. The fact that a victim or witness fails to report a particular detail about a suspect, however, does not mean that the unreported detail necessarily must dispel suspicion.

Additionally, the defendant argues that Officer DeJesus' suspicion should have been dispelled when he stated that his name was Michael, not "O." Officer DeJesus, however, was not required to accept the defendant at his word under these circumstances, and the defendant never produced any identification to verify his identity. See, e.g., *State* v. *Rodriguez*, supra, 239 Conn. 249–50 ("understandably unwilling to rely on the honor system under the circumstances, [the officer] asked the defendant for identification in order to verify the name he had given"). Moreover, Officer DeJesus testified that he had difficulty understanding the defendant's mumbled responses and thought he had said something like Michael but was unsure. Under these circumstances, the defendant's actions did not serve to dispel Officer DeJesus' reasonable and articulable

State *v.* Lewis

suspicion that the defendant committed the crime under investigation.

Thus, on the basis of the totality of the circumstances, including the similarities in clothing, the geographical and temporal proximity to the crime scene, the time of day, and the defendant's location, Officer DeJesus had reasonable and articulable suspicion to seize the defendant. Therefore, the Appellate Court properly concluded that the trial court had correctly determined that the seizure was lawful under both the state and federal constitutions.

III

Finally, the defendant claims that even if his seizure was lawful, the subsequent patdown during which his gun was found was unlawful under both the state and federal constitutions[20] because Officer DeJesus lacked reasonable and articulable suspicion that he might be armed and dangerous. Specifically, he argues that the violent nature of the crime under investigation could not provide reasonable suspicion because it should have been clear to Officer DeJesus that he did not match the description of the suspect and because he said his name was Michael, not "O." He argues that to the extent that Officer DeJesus believed that he matched the description of the suspect, Officer DeJesus knew, under the collective knowledge doctrine, that the suspect was not armed, thereby dispelling any suspicion that he might be armed. He further argues that his behavior was not suspicious and that to the extent that he appeared intoxicated, such behavior did not create reasonable suspicion that he might be armed and dangerous. He argues that mumbling alone did not create suspicion of his being armed and that his unwillingness to answer Officer DeJesus' questions could not be used against

[20] The test for reasonable and articulable suspicion is the same under both the state and federal constitutions. See footnote 14 of this opinion.

State *v.* Lewis

him to justify the patdown. See *Florida* v. *Royer*, 460
U.S. 491, 497–98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)
("[t]he person approached, however, need not answer
any question put to him . . . and his refusal to listen or
answer does not, without more, furnish those grounds"
[citations omitted]).

The state counters that the trial court and the Appel-
late Court correctly determined that Officer DeJesus
had reasonable and articulable suspicion that the defen-
dant might be armed and dangerous on the basis of
the totality of the circumstances. Specifically, the state
argues that reasonable and articulable suspicion was
supported by the violent nature of the crime under
investigation in light of the defendant's having suffi-
ciently matched the description of the suspect, and the
defendant's proximity to the crime scene, the time of
day, and his location, appearance, and behavior. The
state emphasizes the fact that the defendant was stand-
ing alone, late at night, in the pouring rain and close
to the crime scene while appearing to be intoxicated.
We agree with the state that Officer DeJesus had reason-
able and articulable suspicion that the defendant might
be armed and dangerous, principally on the basis of
the defendant's link to a violent crime, specifically, the
report of a domestic violence incident that involved the
choking of the victim.

Under both the state and federal constitutions, "[d]ur-
ing the course of a lawful investigatory detention, if the
officer reasonably believes that the detained individual
might be armed and dangerous, he or she may under-
take a patdown search of the individual to discover
weapons." *State* v. *Wilkins*, supra, 240 Conn. 495–96.
The weapon need not be a gun or be illegally possessed;
rather, the officer must have reasonable and articulable
suspicion only that the detained individual might be
armed with some form of a weapon that might be used
against the officer. See *Terry* v. *Ohio*, supra, 392 U.S.

State *v.* Lewis

29 (patdown must be ''reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer'').

The defendant contends that Officer DeJesus' decision to pat him down was not based on reasonable suspicion but on his subjective belief that all suspects should be patted down. It is true that Officer DeJesus testified at the suppression hearing that ''I pat everybody down. . . . I pat 'em down for my safety.'' We emphatically disapprove of Officer DeJesus' stated practice of patting everyone down and strongly caution against such practices. We echo the thoughtful warning by the Appellate Court that ''such a practice [presents] a high risk of being an unconstitutional intrusion''; *State* v. *Lewis*, supra, 173 Conn. App. 849 n.6; and by Chief Justice Robinson in his concurring opinion in the present case that ''indiscriminately frisking people without the requisite objective justification to do so . . . contributes to the erosion of the trust between our citizens and law enforcement officers.''

Nevertheless, whether a patdown is supported by reasonable and articulable suspicion is an objective standard and is not based on an officer's subjective beliefs. *State* v. *Wilkins*, supra, 240 Conn. 496 (''[r]easonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion'' [internal quotation marks omitted]). Like the determination of the legality of a stop, as explained in part II of this opinion, ''[i]n ascertaining whether reasonable suspicion existed for the patdown search, the totality of the circumstances—the whole picture—must be taken into account.'' (Internal quotation marks omitted.) *State* v. *Mann*, 271 Conn. 300, 323, 857 A.2d 329 (2004). Unlike the determination of the legality of a stop, however,

State *v.* Lewis

the purpose of a patdown search is not to confirm or dispel suspicion of criminal activity but, rather, to confirm or dispel suspicion that a suspect is armed and dangerous. See *State* v. *Clark*, 255 Conn. 268, 282, 764 A.2d 1251 (2001) (explaining that purpose of patdown search is "to ensure [the officer's] own safety and the safety of others nearby" and, thus, patdown search may only be as intrusive as necessary to protect safety of investigating officer).

One factor the court may consider is the nature of the crime under investigation. See, e.g., *State* v. *Nash*, supra, 278 Conn. 635–36; see *State* v. *DelValle*, 109 Conn. App. 143, 154, 950 A.2d 603 ("an officer's impressions about a suspect's connection to violent crime . . . may be considered in the totality of circumstances that support a finding of reasonable suspicion"), cert. denied, 289 Conn. 928, 958 A.2d 160 (2008); see also *United States* v. *Scott*, 270 F.3d 30, 41 (1st Cir. 2001) ("[w]hen the officer suspects a crime of violence, the same information that will support an investigatory stop will without more support a frisk"), cert. denied, 535 U.S. 1007, 122 S. Ct. 1583, 152 L. Ed. 2d 501 (2002).

And, specifically, courts have held that officers appropriately may consider the nature of the crime under investigation when the crime involves domestic violence. See *United States* v. *Mouscardy*, 722 F.3d 68, 75 (1st Cir. 2013) (holding that reasonable suspicion to pat down defendant was supported by fact that defendant was suspect in case involving man who beat woman with whom he had relationship); *United States* v. *Sanchez*, 519 F.3d 1208, 1211, 1216 (10th Cir.) (holding that police officers reasonably suspected that suspect might be armed and dangerous on basis of report that suspect had slapped woman during alleged domestic violence incident), cert. denied, 555 U.S. 870, 129 S. Ct. 167, 172 L. Ed. 2d 121 (2008). There is a split of authority, however, as to whether the fact that the

State *v.* Lewis

crime under investigation involves domestic violence by itself is sufficient, under the federal constitution, to support a finding of reasonable and articulable suspicion to justify a patdown. Some courts have held that the inherent nature of the act of domestic violence itself justifies the patdown of a suspect under investigation for such a crime. See *United States* v. *Mouscardy*, supra, 75 ("The officers were responding to a report of a man beating a woman in the street. When an officer has a reasonable suspicion that a crime of violence has occurred, 'the same information that will support an investigatory stop will without more support a frisk.' " [Emphasis omitted.]); *Goodson* v. *Corpus Christi*, 202 F.3d 730, 738 (5th Cir. 2000) ("[i]f [the defendant] met the description [of the suspect in a domestic violence case], then [the officer] would have reasonable suspicion to suspect [the defendant] of having committed an assault, and would therefore have reasonable suspicion to frisk him"); *People* v. *Mascarenas*, 972 P.2d 717, 721 (Colo. App. 1998) (holding that there was reasonable suspicion to support patdown under *Terry* in domestic violence case even though victim stated that altercation did not involve weapon because "the officers knew that domestic violence situations were particularly dangerous . . . [and] they had been instructed to conduct [patdown] searches in such situations 'for . . . safety to make sure they don't have . . . weapons so they won't harm themselves or the officers' "), cert. denied, Colorado Supreme Court, Docket No. 98SC851 (March 15, 1999); *Williams* v. *State*, 214 Ga. App. 101, 102, 446 S.E.2d 792 (1994) (in case in which defendant was suspected of hitting girlfriend, "[i]t was not unreasonable for [the officer] to anticipate that [the] defendant, who was suspected of having recently committed an assault and battery, might be armed"); see also *Thomas* v. *Dillard*, 818 F.3d 864, 892 (9th Cir. 2016) (Bea, J., concurring in part

State *v.* Lewis

and dissenting in part) ("[W]e have repeatedly [and correctly] recognized the unique dangers law enforcement officers face when responding to domestic violence calls—including the inherent volatility of a domestic violence scene, the unique dynamics of battered victims seeking to protect the perpetrators of abuse, the high rate of assaults on officers' person[s], and the likelihood that an abuser may be armed. I would therefore hold that the domestic violence nature of the call can alone give rise to reasonable suspicion necessary to justify a *Terry* frisk." [Emphasis omitted.]).

One reason for these holdings is that "domestic violence calls are associated with weapons *frequently enough* that an officer can form a reasonable suspicion that a suspect might be armed based on the domestic violence nature of the call." (Emphasis in original.) *Thomas* v. *Dillard*, supra, 818 F.3d 899 (Bea, J., concurring in part and dissenting in part). Specifically, data reports from the Federal Bureau of Investigation show that "thousands of police officers are assaulted every year while responding to domestic violence disputes. One in every five of these assaults involves a deadly weapon (a firearm, a knife, or another 'dangerous weapon')." Id. (Bea, J., concurring in part and dissenting in part).

In contrast, however, other courts have held that although the nature of the crime under investigation may be considered, the label of "domestic violence," standing alone, does not automatically create reasonable suspicion that a suspect is armed and dangerous. Rather, reasonable suspicion must be based on specific facts that establish that the suspect may be armed and dangerous. See id., 885–86 ("Domestic violence encompasses too many criminal acts of varying degrees of seriousness for an officer to form reasonable suspicion [that] a suspect is armed from that label alone. Unless an officer can point to specific facts that demonstrate

State *v.* Lewis

reasonable suspicion that the individual is armed and dangerous, the [f]ourth [a]mendment tolerates no frisk. . . . The domestic violence nature of a call is certainly relevant to an officer's assessment of whether to conduct a search for weapons. . . . [But] [t]he officer's decision to conduct a frisk must be based on the totality of the circumstances, including the full nature and context of the call and the facts the officer actually observes on the scene." [Citations omitted; internal quotation marks omitted.]); *State* v. *Warren*, 37 P.3d 270, 273 n.3 (Utah App. 2001) ("[o]nly where there is a reasonable suspicion of criminal activity and the nature of the crime suggests an increased likelihood that the suspect is armed can a frisk be justified").

We are not constrained in the present case to decide whether a report of domestic violence in itself suffices to justify a patdown once the officer has a reasonable, articulable suspicion to stop a domestic violence suspect. Rather, even if we assume that the label of domestic violence does not by itself automatically justify a patdown search, we conclude, as the trial court did, that the specific facts of the alleged incident raised reasonable and articulable suspicion that the suspect might be armed and dangerous. Officer DeJesus was not only aware that the suspect was under investigation for domestic violence, but also was aware that the alleged domestic violence included choking—a particularly violent crime. Indeed, Officer DeJesus testified at the suppression hearing that one reason he patted down the defendant was because the crime under investigation was domestic violence that involved the choking of the victim.[21]

---

[21] In the present case, the victim reported that she was choked by the suspect. Commentators have noted that although it is common for the terms "choking" and "strangulation" to be used interchangeably, technically, "choking" is defined as "an object in the upper airway that impedes oxygen intake during inspiration and can occur accidentally or intentionally," whereas "strangulation" is defined as "external compression of the neck [that] can impede oxygen transport by preventing blood flow to or from

State *v.* Lewis

For the reasons we will explain in greater detail, we determine that because the defendant was suspected of committing a violent crime—an act of domestic violence that involved choking—and because of his temporal and geographical proximity to the crime scene, the investigating officer had reasonable and articulable suspicion that the defendant might have been armed and dangerous. If the suspect was attempting to assert his dominance over his female victim through choking—a violent and potentially lethal act; see A. Kippert, Domestic Shelters, "Abusers Use Suffocation as a Power Move," (December 3, 2018), available at https:// www.domesticshelters.org/articles/identifying-abuse/ abusers-use-suffocation-as-a-power-move (last visited October 23, 2019) ("abusers strangle their victims as a way to exert power and control over them—they want their victims to know they can kill them at any time"); it was reasonable for the officer to suspect that the defendant also might be in possession of some weapon (gun or otherwise), which, given the volatile nature of the situation, he might use against the officer.

Research studies suggest a strong correlation between choking and future escalated violence involving the use of weapons. See id. ("[s]tudies show most victims [of domestic violence] in the United States are killed by the use of a firearm, but before they are shot, at least 50 percent are strangled" [internal quotation marks omitted]); see also N. Glass et al., "Non-Fatal Strangulation Is an Important Risk Factor for Homicide of Women," 35 J. Emergency Med. 329, 333 (2008) ("strangulation . . . is a significant predictor for future lethal violence"); C. Gwinn, "Men Who Strangle Women

---

the brain or direct airway compression. . . . Therefore, the term 'strangulation' should always be used to specifically denote external neck compression." G. Strack & C. Gwinn, "On the Edge of Homicide: Strangulation as a Prelude," 26 Crim. Just. 32, 33–34 (2011). Clearly, therefore, the victim in the present case was subjected to strangulation. Nevertheless, because the victim specifically reported that she was "choked," we use that term.

State *v.* Lewis

Also Kill Cops,'' 19 Domestic Violence Rep. 85, 85 (2014) (research shows that "a man who strangles a woman once is 800 [percent] more likely to later kill her"). The fact that choking may be the penultimate step to violence involving the use of a weapon does not negate an officer's concern that the suspect "might" have some form of a weapon, which the suspect might use on a police officer when confronted. See *Thomas* v. *Dillard*, supra, 818 F.3d 897 (Bea, J., concurring in part and dissenting in part) ("an officer investigating a report of 'simple battery' may well find that the domestic violence has escalated to assault with a deadly weapon by the time the police arrive"). Indeed, because domestic violence situations are volatile situations in which the suspect at any moment may escalate the violence; see, e.g., *Tierney* v. *Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) ("[c]ourts have recognized the combustible nature of domestic disputes"); it is reasonable for an officer to suspect that the perpetrator might be armed and dangerous, even if a weapon was not used in the reported assault. See *Fletcher* v. *Clinton*, 196 F.3d 41, 50 (1st Cir. 1999) (noting that domestic violence situations are especially volatile, which officers understand because they know that "violence may be lurking and explode with little warning").

Because a domestic violence incident involving choking increases the probability that the suspect might be armed with a weapon, be it a gun or other kind of weapon, it also creates reasonable suspicion that the suspect might threaten the safety of the officer. Studies show that there is a strong link between domestic violence cases in which the suspect is armed and officers are killed or shot in the line of duty. See *Mattos* v. *Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) ("more officers are killed or injured on domestic violence calls than on any other type of call"), cert. denied, 566 U.S. 1021, 132 S. Ct. 2684, 183 L. Ed. 2d 45 (2012), and cert.

State *v.* Lewis

denied, 566 U.S. 1021, 132 S. Ct. 2682, 183 L. Ed. 2d 45 (2012), and cert. denied sub nom. *Daman* v. *Brooks*, 566 U.S. 1030, 132 S. Ct. 2681, 183 L. Ed. 2d 62 (2012), and cert. denied sub nom. *Brooks* v. *Daman*, 566 U.S. 1021, 132 S. Ct. 2682, 183 L. Ed. 2d 45 (2012); *Thomas* v. *Dillard*, supra, 818 F.3d 898 (Bea, J., concurring in part and dissenting in part) ("31.7 percent of assaults on police officers in 2011 occurred while answering domestic violence type radio calls, and 12.7 percent of the [seventy-two] officers killed in 2011 were answering domestic violence calls" [internal quotation marks omitted]); see also *Thomas* v. *Dillard*, supra, 899 (Bea, J., concurring in part and dissenting in part) ("[T]housands of police officers are assaulted every year while responding to domestic violence disputes. One in every five of these assaults involves a deadly weapon [a firearm, a knife, or another 'dangerous weapon'].''); C. Gwinn, supra, 19 Domestic Violence Rep. 85 ("14 [percent] of officers killed in the line of duty are killed in domestic violence or 'domestic dispute' incidents").

The perpetrator in the present case was suspected of committing a violent crime—domestic violence involving choking. The defendant, in turn, was discovered in close geographical proximity to the crime scene, with an appearance generally matching the description of the perpetrator only minutes after the reported assault on the victim and only seconds after the perpetrator was last heard near the victim's home. As explained, situations involving domestic violence are highly volatile; violence may break out at any moment with little to no warning. See *Fletcher* v. *Clinton*, supra, 196 F.3d 50 ("violence may be lurking and explode with little warning"); see also *Tierney* v. *Davidson*, supra, 133 F.3d 197 ("[c]ourts have recognized the combustible nature of domestic disputes"). Upon seeing a police officer, a suspect may believe that the victim called the police, reigniting the situation and possibly escalating

State *v.* Lewis

the level of violence against both the victim and the officer. See *Thomas* v. *Dillard*, supra, 818 F.3d 900 (Bea, J., concurring in part and dissenting in part) ("[E]ven if the initial violence has subsided, it is not uncommon for the perpetrator . . . to erupt into sudden violence or anger at an officer responding to a domestic violence call. . . . If that occurs, the seemingly calm scene can turn dangerous or deadly [if weapons are present] in a matter of seconds." [Citations omitted.]). In light of the volatile nature of domestic violence incidents, when there has been little to no passage of time between the incident and the patdown, a suspect's temporal and geographical proximity to the crime scene supports reasonable and articulable suspicion that the suspect might be armed and dangerous.

In the present case, only about fifteen minutes had passed since the choking occurred and only about one minute had passed since the suspect had been outside the victim's apartment. Although the passage of a sufficient period of time or the creation of geographical distance may in some cases negate reasonable and articulable suspicion because temporal and geographical distance may serve to defuse the volatile nature of the incident; see *State* v. *White*, 856 P.2d 656, 657, 664 and n.10 (Utah App. 1993) (finding no reasonable suspicion to pat down defendant when domestic incident was not ongoing but, rather, had occurred earlier in day at another location); the passage of such a minimal amount of time in the present case did not negate but, rather, supported the officer's suspicion—violence could have reignited and escalated at any moment. Moreover, the fact that there possibly was an innocent explanation for the defendant's proximity to the crime scene does not invalidate the officer's reasonable and articulable suspicion. See, e.g., *State* v. *Peterson*, supra, 320 Conn. 731 ("[w]e do not consider whether the defendant's conduct possibly was consistent with innocent

State *v.* Lewis

activity''). Accordingly, the fact that the defendant reasonably was suspected of committing a violent crime—an act of domestic violence involving choking—coupled with his temporal and geographical proximity to the crime scene, supported reasonable and articulable suspicion that he might have been armed and dangerous.

We find unavailing the defendant's argument that the nature of the crime under investigation cannot be taken into account because he did not match the description of the suspect, as discussed in part II of this opinion. The defendant responds that if Officer DeJesus believed he was the suspect, he did not have reasonable suspicion that he might be armed because Officer DeJesus knew from the 911 call that the suspect was unarmed. Even if, under the collective knowledge doctrine, Officer DeJesus is credited with knowing the details of the 911 call, including the victim's stated belief that the suspect was unarmed, such knowledge does not detract from the reasonable and articulable suspicion that Officer DeJesus had to justify the seizure of the defendant. In response to a question by the 911 dispatcher about whether her assailant was armed, the victim stated that the suspect had no weapons. All this means, however, is that the suspect had no weapons that the victim knew of, not that the suspect was unarmed. Additionally, there was no way for Officer DeJesus to know whether the suspect had acquired a weapon in the interim between the commission of the crime and the seizure.

Accordingly, in light of the nature of the crime under investigation[22]—a domestic violence incident involving

---

[22] We recognize that both the trial court and the Appellate Court relied on other factors to support a finding of reasonable and articulable suspicion to justify the patdown, specifically, the defendant's nervous and evasive behavior, his unwillingness to provide identification, his apparent intoxicated state, and the time of day.

We agree with the trial court and the Appellate Court that such factors properly may be considered as to whether the totality of the circumstances gives rise to reasonable and articulable suspicion. See *State* v. *Edmonds*, supra, 323 Conn. 68–69 (time of day is factor to consider for determining

State *v.* Lewis

choking—and the defendant's geographical and temporal proximity to the crime scene, the patdown of the defendant was supported by reasonable and articulable suspicion. Therefore, the Appellate Court properly concluded that the trial court had correctly determined that the patdown was lawful under both the federal and state constitutions.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

ROBINSON, C. J., with whom MULLINS, J., joins, concurring. I agree with the majority's conclusion that, given the severe nature of the crime under investigation, New Haven police officer Milton DeJesus had reasonable suspicion that the defendant, Demetrice L. Lewis, might be armed and dangerous, which provided an objective justification for his decision to frisk the defendant while conducting a *Terry* stop.[1] I write separately only to emphasize an important observation that I fear may be lost in the sheer comprehensiveness of the majority's well reasoned opinion, namely, our express disapproval of Officer DeJesus' stated practice of pat-

reasonable suspicion to justify patdown); *State* v. *Nash*, supra, 278 Conn. 636 ("nervous and uncomfortable reaction to police interaction factor considered" in determining whether there was reasonable suspicion that defendant might be armed); see also *United States* v. *Mouscardy*, supra, 722 F.3d 75–76 (person's failure to identify himself or to provide identification may justify patdown because such evasive behavior creates suspicion that he is trying to conceal his identity); see also *State* v. *Nash*, supra, 634 ("the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a *Terry* analysis" [internal quotation marks omitted]); *State* v. *Bishop*, 146 Idaho 804, 819, 203 P.3d 1203 (2009) (reasonable suspicion that defendant is armed and dangerous can be based on intoxication).

Nevertheless, we need not address these factors and what weight, if any, they hold in a totality of the circumstances analysis because, in our view, the nature of the crime under investigation, coupled with the defendant's proximity to the crime scene, created reasonable and articulable suspicion that he might be armed and dangerous.

[1] *Terry* v. *Ohio*, 392 U.S. 1, 30–31, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

State *v.* Lewis

ting down "everybody . . . for my safety." Accordingly, I join with and highlight the majority's agreement with the Appellate Court's "disapprov[al] of such a practice as presenting a high risk of being an unconstitutional intrusion, saved, perhaps, only by the operative facts of any such police-public interaction." *State* v. *Lewis*, 173 Conn. App. 827, 849 n.6, 162 A.3d 775 (2017).

While I am deeply sensitive to law enforcement officers' concerns for their safety, it is black letter constitutional law that a law enforcement officer may not frisk or pat down even a validly stopped person in the absence of an objective, reasonable suspicion that the person may be armed and dangerous.[2] See, e.g., *Arizona* v. *Johnson*, 555 U.S. 323, 327, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *Pennsylvania* v. *Mimms*, 434 U.S. 106, 112, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977); *Terry* v. *Ohio*, 392 U.S. 1, 26–27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *United States* v. *Lopez*, 907 F.3d 472, 485–86 (7th Cir. 2018); *Floyd* v. *New York*, 959 F. Supp. 2d 540,

---

[2] I note that, "[w]hen conducting a patdown search of a suspect, the officer is limited to an investigatory search for weapons in order to ensure his or her own safety and the safety of others nearby. . . . The officer cannot conduct a general exploratory search for whatever evidence of criminal activity [he or she] might find. . . . Logically, therefore, a patdown search for weapons that is justified at its inception becomes constitutionally infirm if the search . . . becomes more intrusive than necessary to protect the safety of the investigating officer. . . .

"In order to determine the constitutional validity of [a] patdown search . . . we must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . [We] . . . must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . This is, in essence, a totality of the circumstances test." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 282–83, 764 A.2d 1251 (2001); see, e.g., id., 284–86 (describing factors providing objectively reasonable basis for frisk of defendant, including connection between narcotics trade and weapons, visible nervousness in dealing with police officers, and evidence confirming his connection to narcotics trafficking under investigation).

568–69 (S.D.N.Y. 2013); *State* v. *Clark*, 255 Conn. 268, 281–82, 764 A.2d 1251 (2001); *State* v. *Wilkins*, 240 Conn. 489, 495–96, 692 A.2d 1233 (1997). Accordingly, a police officer's practice of indiscriminately frisking people without the requisite objective justification to do so constitutes a serious violation of the fourth amendment to the United States constitution that contributes to the erosion of the trust between our citizens and law enforcement officers.

As I noted in my concurring opinion in *State* v. *Edmonds*, 323 Conn. 34, 85, 145 A.3d 861 (2016), such practices, "[b]y sowing fear and distrust of police . . . could ultimately make high crime areas even less safe for the people who live there." Such " '[u]ndemocratic policing . . . increases the perception of illegitimacy, which in turn can increase levels of crime and reduce police-citizen cooperation.' . . . Instead 'individuals are more likely to voluntarily comply with the law when they perceive the law to be legitimate and applied in a nondiscriminatory fashion.' "[3] (Citation omitted.) Id.,

_____

[3] As I explained in my concurring opinion in *Edmonds*: "Suspicionless stops are not only a violation of an individual's constitutional rights, they often breed fear and distrust toward police, which, in my view, is an additional unacceptable burden to place on the shoulders of citizens living in high crime areas. . . . As Justice Stevens of the United States Supreme Court has emphasized [in his concurring and dissenting opinion in *Illinois* v. *Wardlow*, 528 U.S. 119, 134 n.10, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)], some citizens, 'particularly minorities and those residing in high crime areas,' flee from police even when they are entirely innocent, believing that any contact with the police can be dangerous. . . . He further noted that these fears 'are validated by law enforcement investigations into their own practices' and that the evidence supporting the reasonableness of these fears 'is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient.' . . . Intuitively, when citizens avoid and actively refuse to interact with police out of fear of becoming a suspect, the opportunities for positive dialogue between the police and citizens disappear. This means that the police will also miss out on learning important information related to actual criminal activity in those communities." (Citations omitted.) *State* v. *Edmonds*, supra, 323 Conn. 83–84 (*Robinson*, *J.*, concurring).

State *v.* Lewis

85–86 (*Robinson, J.*, concurring), quoting I. Bennett Capers, "Rethinking the Fourth Amendment: Race, Citizenship, and the Equality Principle," 46 Harv. C.R.-C.L. L. Rev. 1, 34, 47 (2011). In my view, "the dehumanizing nature of some of these encounters" between citizens and the police is particularly exacerbated by an unjustified frisk;[4] *State* v. *Edmonds*, supra, 84 (*Robinson, J.*, concurring); and I urge our police officers, and particularly those who employ and supervise them, to take all steps appropriate to ensure that interactions between law enforcement and the citizens of our state remains within constitutional bounds.

Although I find Officer DeJesus' apparent standard procedure of frisking "everyone" to be extraordinarily troubling, I nevertheless agree with the majority's conclusion that Officer DeJesus' stop and frisk of the defendant in the present case was independently and objec-

---

[4] Justice Sotomayor of the United States Supreme Court describes how dehumanizing and degrading a stop and frisk may be in her dissenting opinion in *Utah* v. *Strieff*, U.S. , 136 S. Ct. 2056, 2069–70, 195 L. Ed. 2d 400 (2016), observing that: " 'Although many Americans have been stopped for speeding or jaywalking, few may realize how degrading a stop can be when the officer is looking for more. . . . The indignity of the stop is not limited to an officer telling you that you look like a criminal. . . . The officer may next ask for your consent to inspect your bag or purse without telling you that you can decline. . . . Regardless of your answer, he may order you to stand helpless, perhaps facing a wall with [your] hands raised. . . . If the officer thinks you might be dangerous, he may then frisk you for weapons. This involves more than just a pat down. As onlookers pass by, the officer may feel with sensitive fingers every portion of [your] body. A thorough search [may] be made of [your] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet.' . . . As such, the United States Supreme Court has acknowledged that '[i]n many communities, field interrogations are a major source of friction between the police and minority groups.' . . . When police routinely 'stop and question persons on the street who are unknown to them, who are suspicious, or whose purpose for being abroad is not readily evident,' according to the court, such interactions 'cannot help but be a severely exacerbating factor in police-community tensions.' " (Citations omitted.) *State* v. *Edmonds*, supra, 323 Conn. 84–85 (*Robinson, J.*, concurring).

333 Conn. 543        OCTOBER, 2019        599

State *v.* Lewis

tively supported by a reasonable suspicion that he had just committed a domestic violence crime. Accordingly, I join in the majority's excellent opinion affirming the judgment of the Appellate Court.